■ QUOIZEL, INC., Respondent-Appellant, v HARTFORD FIRE IN-SURANCE COMPANY, Appellant-Respondent. [958 NYS2d 355]—

Order, Supreme Court, New York County (Jeffrey K. Oing, J.), entered November 14, 2011, which denied defendant's motion for summary judgment dismissing the complaint, and denied plaintiff's cross motion for summary judgment on its complaint seeking the difference between the amount defendant paid it on its property damage claim, i.e., the cost of replacement, and the selling price of the damaged property, affirmed, without costs.

The disputed stock inventory, consisting of lamps and lighting products, was damaged during a sprinkler system leak in plaintiff's South Carolina warehouse in 2008. The issue before us is whether this stock is to be valued at the selling price or replacement cost under the insurance policy defendant issued to plaintiff.

The policy provides for valuation at the selling price, rather than at the cost of replacement, of damaged " '[s]tock' you have manufactured" and of "component parts manufactured by others that will become a part of your finished product." Although the term "manufacture" or "manufacturer" is not defined, the dissent opines that our decision in *Bijan Designor For Men v Fireman's Fund Ins. Co.* (264 AD2d 48 [1st Dept 2000], *lv denied* 96 NY2d 707 [2001]) is dispositive and that plaintiff may not be deemed to have manufactured the stock within the meaning of the policy because it was assembled by factories in China, which sold it to plaintiff. However, *Bijan* is distinguishable and the motion court correctly found that neither party demonstrated conclusively whether plaintiff can be deemed the manufacturer of the inventory.

*Bijan*, a retailer of high-fashion menswear, selected the materials, designed the clothing line and provided detailed specifications for its manufacture by Italian factories (264 AD2d at 50). While it may have been considered the manufacturer as that term was used in the fashion industry, we held that the reference in the insurance policy to " 'finished goods . . . manufactured by you,' plainly contemplates the concept of manufacturing in its ordinarily understood sense, i.e., the fabrication of a final product through the use of raw materials" (*id.* at 52). Thus, we found that Bijan was not the manufacturer for the purposes of the policy because the actual physical production of the clothing was carried out by foreign factories, which

held title to the goods until Bijan received and accepted the finished product (*id.* at 54). However, unlike Bijan, which only visited the factories from time to time to provide oversight (*id.* at 50), here plaintiff asserts that it was intricately involved in the management and daily process of manufacturing at the factories in China, and that it is more than just the architect of the damaged stock.

Plaintiff is a member of the American Association of Lighting Manufacturers and the originator and owner of 54 active patents and 14 active trademarks concerning the design and manufacture of its products. Its consolidated financial statements identify it as a manufacturer, as does its website.

In 2008, plaintiff maintained an office in China, with a staff of approximately 27 employees, and expended almost $3 million for the daily employment of its own engineers, designers and "cad operators" who worked closely with 15 factories, one of which was allegedly co-owned by plaintiff. All products manufactured in China bore stamps with plaintiff's name, and plaintiff provided a lifetime warranty and performed the warranty repairs.

Plaintiff also alleges that it approved all sources of raw materials and selected the specific raw materials used in the manufacture and assembly of its products. It alleges that its designers were regularly present at each of the factories to oversee production runs to ensure that its design specifications were being followed, and that its manufacturing engineers and inspectors were present on a daily basis at each of the factories then in production to oversee fabrication and manufacturing operations, to perform spot inspections during each step of the manufacturing process, and to inspect and approve finished goods prior to shipment to its South Carolina warehouse. Most significantly, plaintiff alleges that, throughout the manufacturing process, it maintained ownership of the stock in production, and that the purchase orders were used by the parties as a means by which the stock entered the United States.

This active role in the fabrication of its product, including oversight and quality control procedures that permitted plaintiff to "stop production" in the Chinese factories, raises a material issue of fact as to whether plaintiff may be deemed a manufacturer of the disputed stock.

Accordingly, the respective summary judgment motions of the parties were correctly denied.

We have considered the parties' remaining arguments and find them unavailing. Concur—Andrias, Saxe and Román, JJ.

Gonzalez, P.J., and DeGrasse, J., dissent in part in a memo-

randum by DeGrasse, J., as follows: I respectfully dissent as I would modify the order entered below and grant the motion by defendant, Hartford Fire Insurance Company, for summary judgment dismissing the complaint.

Hartford issued a commercial property insurance policy to plaintiff, Quoizel, Inc. This case turns on the meanings of two phrases used in the policy: " 'Stock' you have manufactured" and "component parts manufactured by others that will become a part of your finished product." In my view, the unambiguity of the policy language at issue, coupled with the undisputed facts in the record, mandates summary judgment in favor of Hartford.

Quoizel is a vendor of decorative lighting fixtures. On September 2, 2008, Quoizel sustained water damage at its warehouse in South Carolina. The relevant claim under the policy stems from damage to inventory consisting of lamps and other lighting products that were boxed in the warehouse. The parties differ as to how the damaged inventory should be categorized under the policy.

The policy obligated Hartford to "pay for direct physical loss or direct physical damage to Covered Property caused by or resulting from a Covered Cause or Loss." It is undisputed that the inventory constituted "Covered Property" and that the water damage constituted a "Covered Loss." The policy provided the following with respect to the valuation of covered property:

## "E. LOSS PAYMENT AND VALUATION CONDITIONS

"Covered Property will be valued at either Replacement Cost or Actual Cash Value, as stated in the Property Choice Declarations and as described below except for the items listed below in item 3. . . .

"3. Specific Property Valuations . . .

## "g. 'Stock'

"(1) Manufactured Stock

"We will determine the value of 'Stock' you have manufactured at the selling price less discounts and expenses you otherwise would have incurred.

"This also applies to component parts manufactured by others that will become a part [sic] of your finished product."

After reporting the loss to Hartford, Quoizel made a claim under the policy. Hartford determined that the claim for the damaged inventory should be adjusted on the basis of actual cash value or replacement cost pursuant to the policy's loss payment and valuation conditions. Quoizel contends that the claim should have been adjusted on the basis of the selling price of

the damaged inventory. In particular, Quoizel alleges that the damaged inventory consisted of stock that it had manufactured. Quoizel brought this action to recover the difference between the selling price of the damaged inventory and the amount paid by Hartford as its undisputed actual cash value. The motion court denied the parties' respective motions for summary judgment, finding a factual issue as to whether the damaged inventory was manufactured by Quoizel within the meaning of the policy. Based on the following undisputed facts, I would modify to the extent of granting Hartford's motion.

Quoizel's damaged inventory was manufactured at 15 factories that were operated by third-party entities in the People's Republic of China.* The inventory consisted of products that were fabricated according to Quoizel's drawings and specifications. Except as stated in the footnote below, Quoizel did not own the factories and held no interest in the entities that ran them. The third-party operating entities purchased the raw materials, supplied the labor force, owned the machinery and applied the physical labor that went into production of the finished product that constituted Quoizel's inventory. Quoizel incurred no expense in connection with incidents of production, i.e., the raw materials, labor, overhead or machinery. Instead, Quoizel paid for finished products under the terms of standard form purchase orders that it issued. Quoizel maintained a staff of approximately 27 employees who worked at one office in China. Those employees consisted of designers, computer assisted design operators and inspectors who worked closely with the operators of the 15 factories. I do not share the majority's view that Quoizel's employment of these professionals is sufficient to raise an inference of de facto ownership and control over the manufacture of the products.

Quoizel makes much of the fact that its products had been certified by Underwriters Laboratories (UL), a product safety testing and certification organization. Quoizel's vice president stated in an affidavit that it was his "understanding" that UL grants such certifications to manufacturers only. This assertion is based on hearsay and belied by the record. By their own terms, the purchase orders are the only legally binding documents for Quoizel's purchases from its suppliers. The terms and conditions set forth on Quoizel's purchase order form provide as follows: "All products must be manufactured and labeled in accordance to Underwriter [sic] Laboratories Standard 1598 for

---

* Quoizel was the co-owner of one factory that was operated by a company named Design Emporium, Ltd. Approximately 15% of Quoizel's annual production output came from that factory.

Incandescent and Fluorescent Luminaries or Standard 153 for Portable Lamps. *Quoizel* will be responsible for submitting product for UL testing and fees associated with maintaining the UL procedures for those products. *The Manufacturer* will be responsible for purchasing all labels from UL and for any fees associated with local inspections. . . . *[T]he Manufacturer will be required to provide a complete packaged sample (free of charge) to Quoizel*" (emphases added). Here, the terminology Quoizel used in its purchase order form clearly demonstrates that it did not regard itself as a manufacturer. I, therefore, find no basis for the motion court's conclusion that the purchase orders are not dispositive evidence that Quoizel is not a manufacturer but are merely the means of getting the products into the United States. It is well established that clear and unambiguous provisions of an insurance policy must be given their plain and ordinary meaning (*United States Fid. & Guar. Co. v Annunziata*, 67 NY2d 229, 232 [1986]). In my view, the motion court erred in finding an issue of fact. The interpretation of an unambiguous insurance policy provision, which is all the parties' motions called for, is a matter of law for the court (*see White v Continental Cas. Co.*, 9 NY3d 264, 267 [2007]). Our decision in *Bijan Designor For Men v Fireman's Fund Ins. Co.* (264 AD2d 48 [1st Dept 2000], *lv denied* 96 NY2d 707 [2001]) is controlling with respect to the interpretation of the phrase " 'Stock' you have manufactured" in the insurance policy before us.

*Bijan* involved a claim under a commercial policy for damage to inventory consisting of clothing. The insured in *Bijan* was a designer and retailer of the clothing. The insured in *Bijan* sought to recover from the insurer the selling price of the damaged clothing as opposed to its replacement cost. The policy that was before us in *Bijan* provided that "[s]tock that is *finished goods and manufactured by you* will be valued at the price for which it could have been sold if there had been no loss, less discounts and unincurred expenses" (264 AD2d at 49). The *Bijan* policy also provided that "[s]tock that is *finished goods that you have purchased from others for resale* will be valued at Replacement Cost" (*id.*). In analyzing the policy in *Bijan*, we concluded that its reference to " 'finished goods . . . manufactured by you,' plainly contemplate[d] the concept of manufacturing in its ordinarily understood sense, i.e., the fabrication of a final product through the use of raw materials" (*id.* at 52). Accordingly, we deemed the phrase a reference to "goods resulting from actual, physical work performed on raw materials" (*id.*). Like Quoizel, the insured in *Bijan* conceived and designed the merchandise it sold, selected the materials from which it was

made and provided detailed specifications for its manufacture (*id.* at 50). Nevertheless, the actual physical production of the clothing involved in *Bijan* was carried out by factory operators that contracted with the insured (*id.*). *Bijan* is also similar to the case now before us because title to the goods did not pass to the insured until they were received with an accompanying invoice (*id.*).

Quoizel argues that the instant policy is ambiguous because a Hartford employee stated in an internal email that he was uncertain as to whether the subject claim should be adjusted on the basis of cost or selling price. As I note above, the key word "manufactured," as used in the policy before us, is clear and unambiguous and must be given its ordinary meaning (*see United States Fid. & Guar. Co.*, 67 NY2d at 232). Therefore, extrinsic evidence of what the parties understood, such as the email that Quoizel relies upon, is irrelevant and insufficient to create an issue of fact (*see Katz v American Mayflower Life Ins. Co. of N.Y.*, 14 AD3d 195, 200 [1st Dept 2004], *affd* 5 NY3d 561 [2005]).

Finally, there is also no merit to Quoizel's claim that the damaged inventory should be valued at its selling price because each piece of inventory consisted of component parts. As stated above, the value Quoizel seeks applies to component parts manufactured by others that *will* become parts of finished products. Accordingly, Quoizel cannot obtain the requested value for products that are already completed, even if the products' component parts were manufactured by others. **[Prior Case History: 33 Misc 3d 1223(A), 2011 NY Slip Op 52083(U).]**